AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
### for the
Central District of California

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) |
| | )    Case No.   2:21-MJ-   02333 |
| A 2017 Tesla with California license plate 8VHM522 and Vehicle Identification Number 5YJSA1E26HF185125, registered to Zain Sohail Moosani | ) |
| | ) |
| | ) |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

> *See Attachment A-3*

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

> *See Attachment B*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1); 846 | Distribution and Possession with Intent to Distribute Controlled Substances; Conspiracy and Attempt to Distribute Controlled Substances |

The application is based on these facts:

> *See attached Affidavit*

☒ Continued on the attached sheet.

☐ Delayed notice of _____ days (*give exact ending date if more than 30 days*: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

/s/
_____
*Applicant's signature*

Logan Bonifas, Special Agent, Drug Enforcement Agency
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: ___5/11/21_____

City and state: Los Angeles, CA

_____
*Judge's signature*

Honorable Steve Kim, U.S. Magistrate Judge
*Printed name and title*

AUSA: JohnPaul LeCedre_____

## ATTACHMENT A-3

VEHICLE TO BE SEARCHED

A 2017 Tesla with California license plate 8VHM522 and Vehicle Identification Number 5YJSA1E26HF185125 registered to "Zain Moosani" at 111 S. Belleza Lane, Anaheim, California 92807 ("**Subject Vehicle 1**").

**ATTACHMENT B**

I.    **ITEMS TO BE SEIZED**

1.    The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 21 U.S.C. § 841(a)(1) (distribution and possession with intent to distribute controlled substances) and 21 U.S.C. § 846 (conspiracy and attempt to distribute controlled substances)(the "Subject Offenses"), namely:

a.    Any controlled substance, controlled substance analogue, or listed chemical;

b.    Items and paraphernalia for the manufacturing, distributing, packaging, sale, or weighing of controlled substances, including scales and other weighing devices, plastic baggies, food saver sealing devices, heat sealing devices, balloons, packaging materials, containers, and money counters;

c.    Items used in the packaging of currency for consolidation and transportation, such as money-counting machines, money wrappers, carbon paper, rubber bands, duct tape or wrapping tape, plastic wrap or shrink wrap, and plastic sealing machines;

d.    United States currency over $1,000 or bearer instruments worth over $1,000 (including cashier's checks, traveler's checks, certificates of deposit, stock certificates, and bonds) (including the first $1,000), and data, records, documents, or information (including electronic mail, messages over applications and social media, and photographs) pertaining to, obtaining, possessing, using, applications for, or

i

transferring money over $1,000, such as bank account records, cryptocurrency records and accounts;

      e.   Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses, and forensic copies thereof.

      f.   With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

      i.   evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

      ii.   evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

      iii. evidence of the attachment of other devices;

      iv.   evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

      v.   evidence of the times the device was used;

      vi.   passwords, encryption keys, biometric keys, and other access devices that may be necessary to access the device;

vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

viii.    records of or information about Internet Protocol addresses used by the device;

ix.  records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

g.  Documents and records reflecting the identity of, contact information for, communications with, or times, dates or locations of meetings with co-conspirators, sources of supply of controlled substances, or drug customers, including calendars, address books, telephone or other contact lists, pay/owe records, distribution or customer lists, correspondence, receipts, records, and documents noting price, quantities, and/or times when drugs were bought, sold, or otherwise distributed, whether contained in hard copy correspondence, notes, emails, text messages, photographs, videos (including items stored on digital devices), or otherwise;

h.  Records, documents, programs, applications and materials, or evidence of the absence of same, sufficient to show call log information, including all telephone numbers dialed from any of the digital devices and all telephone numbers

accessed through any push-to-talk functions, as well as all received or missed incoming calls;

       i.   Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show SMS text, email communications or other text or written communications sent to or received from any of the digital devices and which relate to the above-named violations;

       j.   Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show instant and social media messages (such as Facebook, Facebook Messenger, Snapchat, FaceTime, Skype, and WhatsApp), SMS text, email communications, or other text or written communications sent to or received from any digital device and which relate to the above-named violations;

       k.   Audio recordings, pictures, video recordings, or still captured images related to the purchase, sale, transportation, or distribution of drugs;

       l.   Contents of any calendar or date book;

       m.   Global Positioning System ("GPS") coordinates and other information or records identifying travel routes, destinations, origination points, and other locations; and

       n.   Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses, and forensic copies thereof.

       o.   With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

i.   evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

ii.   evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

iii. evidence of the attachment of other devices;

iv.   evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

v.   evidence of the times the device was used;

vi.   passwords, encryption keys, biometric keys, and other access devices that may be necessary to access the device;

vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

viii.   records of or information about Internet Protocol addresses used by the device;

ix.   records of or information about the device's Internet activity, including firewall logs, caches, browser

history and cookies, "bookmarked" or "favorite" web pages,
search terms that the user entered into any Internet search
engine, and records of user-typed web addresses.

2.   As used herein, the terms "records," "documents,"
"programs," "applications," and "materials" include records,
documents, programs, applications, and materials created,
modified, or stored in any form, including in digital form on
any digital device and any forensic copies thereof.

3.   As used herein, the term "digital device" includes any
electronic system or device capable of storing or processing
data in digital form, including central processing units;
desktop, laptop, notebook, and tablet computers; personal
digital assistants; wireless communication devices, such as
telephone paging devices, beepers, mobile telephones, and smart
phones; digital cameras; gaming consoles (including Sony
PlayStations and Microsoft Xboxes); peripheral input/output
devices, such as keyboards, printers, scanners, plotters,
monitors, and drives intended for removable media; related
communications devices, such as modems, routers, cables, and
connections; storage media, such as hard disk drives, floppy
disks, memory cards, optical disks, and magnetic tapes used to
store digital data (excluding analog tapes such as VHS); and
security devices.

II.  <u>**SEARCH PROCEDURE FOR DIGITAL DEVICE(S)**</u>

4.   In searching digital devices (or forensic copies
thereof), law enforcement personnel executing this search
warrant will employ the following procedure:

a.   Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location.   The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant.   The government will not search the digital device(s) and/or forensic image(s) thereof beyond this 120-day period without obtaining an extension of time order from the Court.

b.   The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.   The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized.   The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

ii.   The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool

Kit), which tools may use hashing and other sophisticated techniques.

       c.  The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

       d.  If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

       e.  If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

       f.  If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

       g.  The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been

able to fully search a device because the device or files contained therein is/are encrypted.

       h.   After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

     5.   The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

     6.   In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

       a.   Any digital device capable of being used to commit, further, or store evidence of the offense(s) listed above;

       b.   Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

       c.   Any magnetic, electronic, or optical storage device capable of storing digital data;

d.    Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

e.    Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

f.    Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g.    Any passwords, password files, biometric keys, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

7.    During the execution of this search warrant, law enforcement is permitted to (1) depress Zain Sohail Moosani's ("MOOSANI") or Joseph Keith Lang's ("LANG") thumb- and/or fingers onto the fingerprint sensor of a digital device (only if the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of MOOSANI's or LANG's face with their eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device.  In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in Graham v. Connor, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

x

8.    The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

## <u>AFFIDAVIT</u>

I, LOGAN D. BONIFAS, being duly sworn, declare and state as follows:

## I.  <u>PURPOSE OF AFFIDAVIT</u>

1.    This affidavit is made in support of a criminal complaint and arrest warrants against ZAIN SOHAIL MOOSANI ("MOOSANI") and JOSEPH KEITH LANG ("LANG") for violation of 21 United States Code Section 841(a)(1) (Distribution of Controlled Substances).

2.    This affidavit is also made in support of applications for warrants to search:

a.    MOOSANI's residence, located at 111 S. Belleza Lane, Anaheim, California 92807 ("**Subject Premises 1**"), as described more fully in Attachment A-1;

b.    LANG's residence, located at 6183 Academy Avenue, Riverside, California 92506 ("**Subject Premises 2**"), as described more fully in Attachment A-2;

c.    A 2017 Tesla with California license plate 8VHM522 and Vehicle Identification Number ("VIN") 5YJSA1E26HF185125 ("**Subject Vehicle 1**"), registered to MOOSANI at **Subject Premises 1**, as described more fully in Attachment A-3;

d.    A 2005 Dodge Neon with California license plate 8DDX921 and VIN 1B3ES66S15D113744 ("**Subject Vehicle 2**"), registered to LANG at **Subject Premises 2**, as described more fully in Attachment A-4;

e.    A 2016 Fiat with California license plate 7VCM747 and VIN ZFBCFXBT4GP361764 ("**Subject Vehicle 3**"), registered to R.C. at **Subject Premises 2**, as described in more fully in Attachment A-5;

f.    The person of MOOSANI, as described more fully in Attachment A-6; and

g.    The person of LANG, as described more fully in Attachment A-7.

3.    The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 21 U.S.C. § 841(a)(1) (Distribution and Possession with Intent to Distribute Controlled Substances) and 21 U.S.C. § 846 (Conspiracy and Attempt to Distribute Controlled Substances) (the "Subject Offenses"), as described more fully in Attachment B.

4.    Attachments A-1, A-2, A-3, A-4, A-5, A-6, A-7, and B are incorporated herein by reference.

5.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint, arrest warrant, and search warrants, and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. <u>BACKGROUND OF AFFIANT</u>

6.   I am an investigative and law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7), who is empowered to conduct investigations of, and to make arrests for, the drug trafficking offenses enumerated in Title 18, United States Code, Section 2516.

7.   I am a Special Agent ("SA") with the Drug Enforcement Administration ("DEA"), and I have served as a SA since April 2019.  I am currently assigned to the DEA's High Intensity Drug Trafficking Area ("HIDTA") division in Los Angeles, California.  Additionally, I am a member of the HIDTA Fusion Task Force, which is tasked with the investigation of opioid related cases and suspected opioid-related overdose deaths in Los Angeles County.  HIDTA Fusion Task Force is comprised of DEA and FBI special agents.

8.   Prior to my employment with the DEA, I was employed for five years by the Ohio State Highway Patrol as an Intern and State Trooper.  My work in drug investigations has included conducting and participating in physical surveillance, drafting and executing search warrants, and conducting arrests.  As a SA and a State Trooper, I have interviewed narcotics users, buyers, sellers, manufacturers, transporters, and informants, and I have discussed with them various methods they use to safeguard their drug stashes and illicit proceeds and to avoid law enforcement detection.  Based on my knowledge, training, experience, and conversations with other experienced law enforcement officers, I

am familiar with drug traffickers' methods of operation, including the distribution, storage, and transportation of drugs, as well as the collection of monetary proceeds of drug trafficking.  I am also familiar with how digital devices are used to facilitate and conceal these crimes.  My experience as a SA and State Trooper have allowed me to develop a broad understanding of drug crimes, drug offenders, and the daily operations and common practices of drug trafficking organizations.

9.   My training entailed specialized drug trafficking investigative matters, including, but not limited to, drug interdiction, money laundering techniques and schemes, smuggling, financial investigations, controlled substance identification, physical and electronic surveillance, confidential source management, undercover operations, and the investigation of individuals and organizations involved in the smuggling, cultivation, manufacturing, and trafficking of controlled substances.

10.   I have participated in numerous drug trafficking investigations, and I have also spoken with defendants as well as confidential informants regarding the possession, sales and distribution of illegal substances.  In conducting these drug trafficking investigations, I have utilized a variety of investigative techniques and resources, including physical and electronic surveillance, and various types of informants and cooperating sources.  Through the above-mentioned investigations, my training and experience, and conversations

with other experienced agents and law enforcement personnel, I
have become familiar with the methods used by drug traffickers
to smuggle and safeguard drugs, distribute drugs, and to collect
and launder illicit drug-related proceeds.

11.  Based on my training and experience, I know that
persons involved in the illicit distribution of controlled
substances often attempt to conceal their identities, as well as
the locations at which drug transactions take place.  They are
also known to have vehicles, properties, utilities, and other
purchases under fictitious names and/or in the names of other
individuals to conceal their criminal activities and financial
transactions.  I am aware that persons engaged in organized drug
distribution and sales maintain contact with individuals from
whom they receive and/or to whom they distribute drugs.  I know
that in order to do this effectively, these persons maintain
continued access to telephone communication, including both
voice and text.

### III.  <u>SUMMARY OF PROBABLE CAUSE</u>

12.  In December 2020, law enforcement arrested D.A. in
connection with several purchases of narcotics within the
Central District of California.  A search of D.A.'s telephone
revealed D.A. was obtaining narcotics, including lysergic acid
diethylamide ("LSD"), from MOOSANI.

13.  Specifically, law enforcement observed communications
between D.A. and MOOSANI regarding delivery of approximately
1,000 tabs of LSD.  Historical cell-site data and toll analysis
indicated LANG delivered the 1,000 tabs of LSD which was later

seized by law enforcement pursuant to a search of D.A's residence.

14.   In February 2021, an undercover agent ("UCA") was introduced and communicated with MOOSANI.  On April 21, 2021, law enforcement conducted a controlled purchase of suspected LSD and suspected cocaine from LANG, which was arranged and directed by MOOSANI.

### IV. STATEMENT OF PROBABLE CAUSE

15.   Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

**A.   D.A. Sold LSD, Xanax, and Other Drugs to a CS from August 2020 to November 2020**

16.   From August 2020 to November 2020, a Naval Criminal Investigative Service ("NCIS") confidential source ("CS")[1], under NCIS direction, purchased drugs from D.A. on four different occasions.

a.   On August 28, 2020, during a controlled and recorded purchase, D.A. sold a "sheet" (approximately 100 tabs) of LSD, eighteen suspected Xanax "bars", and four "pressed" Oxycodone pills for $600 to the NCIS-directed CS.  DEA Southwest Laboratory confirmed the LSD to be 1.1202 grams of LSD and

---

[1] This CS has cooperated with the NCIS since February 2020 when he/she was arrested for a violation of 21 United States Code Section 841(a)(1) (Distribution of Controlled Substances). Since that time, the CS has provided information pertaining to the arrest/investigation of over 50 individuals, including many involving drug seizures.  The information provided by the CS has been corroborated and has proven to be reliable.  Prior to the CS being arrested by NCIS, he/she had no known prior arrests or convictions.

cocaine, the Xanax "bars" to be 4.4422 grams of etizolam, and the "pressed" Oxycodone to be 0.4242 grams of fentanyl and acetaminophen.

      b.   On September 18, 2020, during a controlled and recorded purchase, D.A. sold one and a half "sheets" (approximately 150 tabs) of LSD and approximately thirty-four suspected "pressed" Oxycodone pills for $1,105 to the NCIS-directed CS.  DEA Southwest Laboratory confirmed the LSD to be approximately 1.8961 grams of LSD and cocaine, and the "pressed" Oxycodone to be 3.5484 grams of fentanyl and acetaminophen.

      c.   On October 7, 2020, during a controlled and recorded purchase, D.A. sold two "sheets" (approximately 200 tabs) of LSD and approximately one hundred Xanax "bars" to the NCIS-directed CS.  DEA Southwest Laboratory confirmed the LSD to be 1.9586 grams of LSD, and the Xanax "bars" to be 25.686 grams of etizolam.

      d.   On or about November 24, 2020, during a controlled and recorded purchase, D.A. sold three "sheets" (approximately 300 tabs) of LSD and approximately 3.5 grams of cocaine to the NCIS-directed CS.  DEA Southwest Laboratory found the suspected LSD to be 5.96 grams of no controlled substances, despite its appearance being consistent with LSD.  The lab determined the suspected cocaine to be 3.56 grams of cocaine and lidocaine.

**B.   Search of D.A.'s Residence**

17.   On December 4, 2020, the Honorable Alexander F. MacKinnon, United States Magistrate Judge, issued a search

warrant, in case number 20-MJ-05902, for D.A.'s residence in West Covina, California ("D.A.'s Residence").

18.   On December 10, 2020, DEA and NCIS agents executed the search warrant at D.A.'s Residence and seized D.A.'s cellular telephone ("D.A.'s Telephone") pursuant to the warrant.  During the search warrant at D.A.'s Residence, law enforcement seized large amounts of drugs, including cocaine and LSD, one non-serialized, short-barreled, fully automatic rifle, one .25 caliber pistol, one black Phazzer Taser, one metal rifle suppressor, and United States currency.  Specifically, on the couch of D.A.'s Residence in the living room, law enforcement seized one "page," or approximately 1,000 tabs, of LSD.  DEA Southwest Laboratory confirmed these 1,000 tabs to contain 20.166 grams of LSD and 0.0203 grams of cocaine, MDMA, and caffeine.

**C.   D.A. Obtained a "Page" of LSD from MOOSANI and LANG**

19.   Text messages from D.A.'s Telephone, searched pursuant the warrant executed at D.A.'s Residence, show that on the night of December 9, 2020, the night prior to the execution of the search warrant, D.A. obtained a "page" of LSD arranged by MOOSANI via Snapchat and text messages, delivered by MOOSANI's drug runner who was later identified as LANG.

1.   The CS Asks D.A. for a "Page" of LSD

20.   On or about December 9, 2020, the day before law enforcement executed the search warrant on D.A.'s Residence, the

following text message exchange occurred between the CS and
D.A.:

    CS:  "Hey when will you be back in town btw? My friend is
just asking who I'm splitting the page with"

        "I hope your grandma is doing ok too [emoji]"

    D.A.: "I'm just waiting on it to get here my boy said he's
coming today just waiting on him."

    CS: "Oh okay for sure"

        "Thank u so much"

        "Oh btw what else do you have enough?"

        "Rn^*"

        "Will you let me know if you have it for tomorrow?
It's my only day off this week"

    D.A.: "Got it"

        "Yeah tm we can link"

        [Sent photograph of drug menu]

        "That's what I have rn."

    CS: "Lemme send it to my friend and ask them if they wanna
split anything else"

    D.A.: "Ok cool"

    CS: "How much is it he's"

        "BTW"

    D.A.: "26 remember"

        "It's saved in the chat as well"

        "For the page."

2.   D.A. asks MOOSANI for LSD via Social Media

21.   On or about December 9, 2020, and around the time of the above message exchange with the NCIS-directed CS and D.A., the following message exchange began between D.A. and MOOSANI (with the username: "zainard") and saved in D.A.'s Phone as "Zain Moosani(E N Add)"[2], through the social media application, Snapchat:

D.A.: "Actually yeah I got someone who needs a page and then the half boat.  When can u get it down here by?"

"A half boat of addy and page of acid"

"What time today?"

MOOSANI: "Okay I gotchu"

"Whats the half boat[3] for anf the page"

"Ur total is 2250?"

"2k plus 1250"

"3250"

D.A.: "You usually do me half boat of addy for 1k and the page is 2k right?"

[Photograph sent to MOOSANI]

MOOSANI: "Got it"

"3k is your total"

_____

[2] A California Law Enforcement Telecommunications System ("CLETS") database query of MOOSANI revealed the name of "Zain S. Moosani."

[3] Based on my training and experience, I know that a "boat" is slang for "1,000" units of drugs.

D.A.:      "Fasho lmk when you can drop it off I kinda need them as soon as possible"

MOOSANI: "Today"

"Its yours"

"I need the money packaged up so the driver does not see anything."

"3k"

D.A.: "Yup lmk when it's otw"

MOOSANI: "Yes sirr"

22.   Based on my knowledge, training, and experience, I believe the "page" that D.A. is referring to is the "page" of LSD that the CS ordered from D.A. and that was then seized the next day by law enforcement from D.A.'s Residence.

### 3.   Identification of MOOSANI's Telephone

23.   MOOSANI's Telephone, a number ending in 9551, is believed by law enforcement to be used by MOOSANI.  MOOSANI provided MOOSANI's Telephone to the Anaheim Police Department in 2020 during a vehicle crash, and law enforcement database records show MOOSANI's Telephone is associated with MOOSANI.  In addition, MOOSANI's Snapchat name is saved in D.A.'s phone under the Snapchat name: "Zain Moosani (E N Add)", and MOOSANI's Telephone is saved in D.A.'s phone under the name: "Zain".

### 4.   Further Communications between D.A. and MOOSANI Regarding Drug Deals

24.   On or about December 9, 2020, the following text messages were exchanged between D.A. and MOOSANI:

```
D.A.:      "What's up"

MOOSANI:   "Sending my guy. Need address"

           "Remember money packaged up as if it. Doesnt look

           like money. Picture send"

D.A.:      "[Address] n Azusa ave West Covina ca 91791"

MOOSANI:   "I will tell you ETA shortly"

D.A.:      "Fashoo"

MOOSANI:   "6:35"

D.A.:      "Ok"

           "I have it vacuum sealed all edges burned with a

           lighter and tripple knitted inside a McDonald's

           bag."

MOOSANI:   "Perfect <3"

D.A.:      "Lmk when he's here"

           "He here?"

MOOSANI:   "Yeaa hr called you"

D.A.:      "Fasho I'll go out rn"

           "What kinda car?"

MOOSANI:   "Grey neon"

           "U got it"

D.A.: [Photograph of multicolored tabs that appears to be

the "page" of LSD seized from D.A.'s Residence on December

10, 2020]

           "It was 2short"

MOOSANI:   "Lololol fucking peoplee"

           "Im sorry about that"

           "It was probably an accident"
```

12

"Ill take care of it my gu"

"G"

25.  Law enforcement conducted toll analysis of D.A.'s
Telephone around the timeframe of MOOSANI and D.A's text
conversation on December 9, 2020.  According to toll analysis of
D.A.'s Telephone, around this same timeframe, D.A. was in
contact with a telephone number ending in 1550 ("LANG's
Telephone").  Subscriber information from Verizon Wireless of
LANG's Telephone indicated the subscriber is LANG and the
subscriber address is **Subject Premises 2**.  For example, toll
analysis of D.A.'s Telephone indicated LANG's Telephone
contacted D.A. at approximately 6:39 p.m., just four minutes
after the estimated time of arrival that MOOSANI stated his
"guy" would be at D.A.'s Residence.  MOOSANI told D.A. that his
guy would be in a "grey neon".  LANG is the registered owner of
a silver/gray 2005 Dodge Neon (**Subject Vehicle 2**).  Furthermore,
historical cell-site data of LANG's Telephone on December 9,
2020, at approximately 6:39 p.m., indicated LANG's Telephone was
near D.A.'s Residence.

26.  Based on my training and experience, I believe LANG,
at the direction of MOOSANI, delivered the "page," or 1,000
hits, of LSD to D.A. that law enforcement seized from D.A.'s
Residence the following day, in part, because: 1) LANG's
Telephone called D.A.'s Telephone at approximately 6:39 p.m.
corroborating MOOSANI's text to D.A., "Yeaa hr called you", 2)
**Subject Vehicle 2** is registered to LANG, corroborating MOOSANI's
text to D.A. that his "guy" is in a "grey neon", and 3)

according to historical cell-site, LANG's Telephone was near the area of D.A.'s Residence corroborating MOOSANI's confirmation to D.A. that MOOSANI's "guy" was outside D.A.'s Residence.

> **D.   UCA Communications with MOOSANI**

27.  From February 2021 to May 2021, a NCIS UCA communicated with Snapchat username "zainard," the SnapChat account that MOOSANI used to coordinate drug deliveries to D.A., as well as text messages and phone calls with MOOSANI's Telephone.  The Snapchat username "zainard" and the phone number of ending in 9551 are the same Snapchat username and phone number in which law enforcement observed drug communications between D.A. and MOOSANI when law enforcement searched D.A.'s Telephone.  During these communications, MOOSANI spoke to the UCA about MOOSANI's drug trafficking activities, including the sale of LSD and cocaine, as well as discussion of MOOSANI's drug runners.

28.  On or about February 10, 2021, the following Snapchat messages were exchanged between the UCA and MOOSANI, utilizing the Snapchat username "zainard":

MOOSANI: "Whos this?"

UCA:      "Caroline.. we talked last week about the [snowflake emoji]…

     "Lol"

MOOSANI:  "Oh yeaa haha"

          "I have L"

          "I sell vials and gells"

UCA:      "What r ur prices?"

MOOSANI:     "300 a vial"

             "Gell is 2500 a page"

UCA:         "I'll be up that way next week so lemme kno

             "Oh nice"

MOOSANI:     "Which way?"

UCA:         "Sry just got this way"

MOOSANI:     "Where r u at now"

             "Im in Anaheim hills"

UCA:         "I'm San clem"

MOOSANI:     "Ohh gotchu"

             "My drivers can drop off whenever"

29.  Based on my training and experience, I know the term "L" to be LSD, and I believe MOOSANI was referring to **Subject Premises 1** when he referred to being "in Anaheim hills."

30.  On or about February 24, 2021, the following Snapchat messages were exchanged between the UCA and MOOSANI:

MOOSANI:     "Hey"

             "Sorry I forgot"

             "U need L"

             "How many were you looking for"

UCA:         "Yea I'm lookin for someone reliable.."

             "everyone keeps flakin. You got a steady supply?

             "I use to get a page or so a week"

MOOSANI:     "I'm a big L distro"

             "I give lowest prices"

             "How much did u pay for a page?"

             "Ill send a page over to you tomorrow"

31.   Based on my training and experience, I believe MOOSANI is describing to the UCA his ability to obtain multiple pages of L, or LSD, as MOOSANI is "a big L distro", or a large-scale distributor of LSD.

32.   On or about February 25, 2021, the following Snapchat messages were exchanged between the UCA and MOOSANI:

UCA:       "Lol I meant the pic above"

           "I didn't know if u were some chemist or somethin lol"

MOOSANI:   "Ohh noo. Im in sales"

           "My friends are the manufacturures"

33.   Based on my training and experience, I believe MOOSANI is telling the UCA that MOOSANI sells the drugs, while MOOSANI's friends are the manufacturers of the drugs.

34.   On or about February 27, 2021, the UCA observed a photograph of a Tesla steering wheel that captured a portion of the windshield on MOOSANI's Snapchat.  Further, I observed the same photograph, and through the windshield of the Tesla, I observed a garage with white doors, yellow/tan trim, and rock walls.  I know MOOSANI to drive a Tesla (**Subject Vehicle 1**), and I recognized the garage with white doors, yellow/tan trim, and rock walls as **Subject Premises 1**.

35.   In addition to messages with MOOSANI via Snapchat, on March 2, 2021, the following text messages were exchanged between the UCA and MOOSANI utilizing MOOSANI's Telephone:

UCA:       "Hey it's Caroline"

MOOSANI:   "Whatsup!"

"Ur half zip is getting dropped off now."

"Ur page is gonna get picked up around 8"

UCA: "Dang! I thought u had the stuff…?"

MOOSANI: "Hahah"

"They came into the trap but they have to be picked up by the runner"

36.  Based on my training and experience, I know the term "half zip" to mean a half ounce, and in this conversation, I believe that MOOSANI is referring to cocaine, as the UCA had previously ordered a half ounce of cocaine and a page of LSD.

37.  On March 2, 2021, while law enforcement officers were surveilling the area of **Subject Premises 1**, the UCA communicated on a recorded phone call with MOOSANI, via MOOSANI's telephone, regarding the purchase of a page of LSD and a half ounce of cocaine.  The UCA and MOOSANI had the following conversation, in pertinent part:

UCA:       "Umm so can you get the page before 8? Because if not I'm just going to go back south, man?"

MOOSANI:  "Yeah, I mean it's..it's in San Pedro. Like I said my uhh runner can go pick it up. So this is how I do it I have a whole system going right? I have a trap in San Pedro, a trap in Irvine, a trap in uh Orange actually. So I can go and have my runner pick up products from the produ - from the places and he goes and picks up money from wherever it needs to be dropped off at and that's where he comes back to me and brings me

17

all my money because all this product is mine.
I do purchase it.  I just don't get to see it
myself personally.  Does that make sense?"

UCA:        "Yeah, how do you know it's good then?"

MOOSANI:    "Because it's been long time years. Too many
years…too many years of loyalty and just trust
you, know?

UCA:        "Yeah, I guess like if you got one in Orange,
why is it taking so long?

MOOSANI:    "Umm, my 'cause the one that the LSD is in right
now is in San Pedro. Only reason why it is
taking so long is because my runner has a
fulltime job and he was at work earlier and he
lives in Riverside.  So he got off just now at
six and he's leaving Riverside and he's coming
over to me to pick up money, and he is going to
handle your order and he can drop it off to you,
if you want?

UCA:        "So he has to go and meet with you first?"

MOOSANI:    "He's gonna meet with me because I have to give
him money for something else as well because
you're not the only order I have today.

UCA:        "Oh I know, I know. I know you're probably busy.
Umm."

MOOSANI:    "That's why I'm like my apologies. And I invited
you to my house just because so you can get more
comfortability and understanding on what's going

18

on.  And like seeing me and meeting me
personally because I am like the guy that you
would talk to to purchase products. My runner
would be - you wouldn't talk to him because I
would just tell him exactly where to go and what
to drop off.  He barely knows what drugs are you
know?"

\*\*\*

MOOSANI:   "I am about to get your half zip dropped off to
me because the way uh my coke guy works he just
drops it off and what's his name, my runner, he
comes picks up whatever needs to be dropped
off…."

38.   Based on my training and experience, in this
conversation, MOOSANI explained to the UCA that MOOSANI's runner
would meet with MOOSANI to pick up or drop off money, which I
believe to be drug proceeds.  MOOSANI also stated that MOOSANI's
"coke guy" would drop off the cocaine to MOOSANI before
MOOSANI's runner would pick it up from MOOSANI to be delivered.
Lastly, during these communications between the UCA and MOOSANI,
I observed GPS pings of MOOSANI's Telephone, and the GPS pings
were in the vicinity of **Subject Premises 1**.

39.   In addition, based on my training and experience, I
believe MOOSANI is referring to LANG as his runner because
LANG's listed place of employment with California Employment
Development Department ("EDD") is located in Riverside,

19

California, as well as based on the observations regarding
LANG's deliveries of drugs discussed below.

> **E.   Surveillance of Subject Premises 1 During UCA
> Communications on March 2, 2021**

40.  On March 2, 2021, during the communications between
MOOSANI and the UCA, law enforcement conducted surveillance in
the area of **Subject Premises 1**.  Law enforcement observed a male
driving a red Prius travel and stop in the cul-de-sac of **Subject
Premises 1**.  Shortly thereafter, law enforcement observed a male
resembling MOOSANI exit **Subject Premises 1** and sit inside the
red Prius for approximately fifteen minutes.  Then, a
white/silver Mercedes two-door vehicle was observed driving and
stopping in the cul-de-sac of **Subject Premises 1**.  At this time,
the driver of the red Prius and the male resembling MOOSANI
exited the red Prius and met with the white/silver Mercedes.

41.  Based on my training, experience, and conversations
with other law enforcement involved in this surveillance, I
believe the duration of this meeting, the location of this
meeting, and the behavior of the individuals observed, coupled
with communications from MOOSANI to the UCA around the same
time, was consistent with drug trafficking activity.
Specifically, the duration of the meeting was brief and the
location was secluded.  Furthermore, around the time the
surveillance team observed this activity, MOOSANI told the UCA
via MOOSANI's Telephone that MOOSANI was busy and that the UCA
was not MOOSANI's only drug customer.

**F.    Surveillance of LANG and Subject Vehicle 2**

42.   On April 15, 2021, Ontario Regional Interdiction of Narcotics detectives conducted surveillance of LANG and **Subject Vehicle 2** at LANG's place of employment in Riverside, California.  At approximately 6:25 p.m., law enforcement observed LANG depart his place of employment in **Subject Vehicle 2** and park in the driveway of a location on Normandie Place in Riverside, California.  Detective Brennan Falconieri observed a hand-to-hand transaction occur between an unidentified male and LANG in front of **Subject Vehicle 2**.

**G.    The UCA Purchases LSD and Cocaine from LANG Arranged by MOOSANI**

43.   On or about April 16, 2021, the UCA communicated with MOOSANI, via Snapchat.  MOOSANI asked the UCA, "Dont u need a gel page? Lololol".  During this communication, GPS pings on MOOSANI's Telephone indicated MOOSANI was in the area of Miami, Florida.  MOOSANI advised the UCA that MOOSANI could make a delivery happen "no matter where im at".  MOOSANI told the UCA that "Ill have my runner drop off easy".

44.   On or about April 21, 2021, the UCA arranged for the purchase of 1,000 tabs of LSD and one half ounce of cocaine from MOOSANI for $2,800.  Prior to the controlled purchase, MOOSANI told the UCA that MOOSANI's runner would be calling from a "951" telephone number and that the runner's name was "Joe".  At approximately 7:29 p.m., LANG's Telephone texted the UCA, "This is z's delivery I'm 25 mins away" and that he was in a "white-ish" Fiat (**Subject Vehicle 3**).

45.   At approximately 7:58 p.m., SA Jaquilla Wright observed **Subject Vehicle 3** arrive in the parking lot of the Board and Brew Restaurant located at 5701 E. Santa Ana Canyon Road, Anaheim, CA.  Law enforcement observed LANG exit **Subject Vehicle 3** and enter into the UCA vehicle.  A second DEA UCA, observing, monitoring, and recording the activity, was also in the vehicle with the UCA and LANG.  During this controlled purchase, I contemporaneously monitored the audio recording where LANG mentioned there was miscommunication with "Zain".

46.   While inside the UCA's vehicle, LANG gave the UCA a white and orange 7/11 paper bag which contained approximately 1,000 yellow tabs of suspected LSD and approximately one half ounce of a white rock-like substance suspected to be cocaine, in exchange for $2,800.  The 7/11 bag was not sealed when LANG gave the UCA the bag containing the drugs, and by glancing down into the open bag, the suspected LSD and cocaine were visible.  There were no additional items in the 7/11 bag to cover or hide the drugs, which were wrapped in separate clear plastic baggies. The UCA asked LANG if he (MOOSANI) told LANG how much, and after LANG looked at his cellular phone, LANG stated, "28."  The UCA then counted 28 $100 bills and handed the $2,800 to LANG.  DEA Southwest Laboratory confirmed the suspected cocaine to be 13.9 grams of cocaine.  At the time of this affidavit, the testing of the suspected LSD has not been completed and is still ongoing.

47.   Following the transaction, law enforcement observed LANG exit the UCA's vehicle and get back into **Subject Vehicle 3.**

Law enforcement observed LANG driving **Subject Vehicle 3** in the direction of **Subject Premises 1**.

48.   At approximately 8:07 p.m., Detective Jazmine MacMillan observed LANG, driving **Subject Vehicle 3**, arrive and park in the cul-de-sac of **Subject Premises 1**.  At approximately 8:11 p.m., MOOSANI, using MOOSANI's Telephone, contacted the UCA to ensure the drug deal had no issues.  At approximately 8:13 p.m., Detective MacMillan observed MOOSANI enter into the passenger side of **Subject Vehicle 3**.  At approximately 8:17 p.m., Detective MacMillan observed MOOSANI exit **Subject Vehicle 3** and walk into the driveway towards the front of the residence before entering into the walkway of the front door of **Subject Premises 1**.

49.   Based on my training and experience, I know runners of a drug conspiracy are compensated in cash or drugs for their acts that further the drug conspiracy.  I know, based on text messages between D.A. and MOOSANI, that MOOSANI prefers to deal in cash rather than banking applications such as Venmo.  Furthermore, I know cash is a preferred method of payment for drugs to thwart law enforcement detection.  Therefore, based on my training and experience and my knowledge of the investigation, I believe that LANG and MOOSANI met after the controlled purchase so that LANG could deliver the $2,800 from the buy to MOOSANI.

**H.   MOOSANI's Hourly Payment to LANG and Runners**

50.   On May 9, 2021, the UCA communicated with MOOSANI, via Snapchat, about paying LANG and other drug runners.  The UCA and MOOSANI had the following conversation, in pertinent part:

UCA:      "Hey do u mind if I ask how much u pay ur runner? My girl and I were talking about it the other day.."

MOOSANI:  "Started off with 15 an hour plus 50 cents a mile"

          "But joe gets paid 18 and hour plus 50 cents a mile with always a 20-60 dollar tip"

          "depending on how much work"

UCA:      "Why's he get paid more?"

MOOSANI:  "And when hes with his girl sometimes i tell him to go get whatever they want for dinner to save me the receipt and i take care of that also"

          "Cuz hes been with me and been loyal and had soo many things done for me"

          "If hes happy my work gets done"

          "Then im happy"

          "Cuz i have other ppl that ill just tell em hey go drop this off ill pay u 60-100 buc"

          "But this guy will handle the real deals"

UCA:      "Joe?"

MOOSANI:  "And all my money and stuff"

          "Yes hahah"

          "He goes to my trap drops everything off to my clients in a nice professional mannor"

"He also has a full time job.  Its so hard to find someone as reliable trustworthy and consistent or persistent as yourself and he's been the closest"

51.  Based on my training and experience, I believe "Joe" is LANG, and MOOSANI is describing how LANG is compensated for delivering drugs on behalf of MOOSANI.  MOOSANI stated he pays LANG more an hour along with reimbursing LANG for dinner receipts, thus, indicating LANG is a trusted member of MOOSANI's drug trafficking organization.

I.    **GPS Pings of MOOSANI and LANG**[4]

52.  During the course of this investigation, I monitored prospective GPS pings of MOOSANI, and a large portion of the pings of MOOSANI's Telephone were in the vicinity of **Subject Premises 1**.  Furthermore, in the evening and early morning hours of a day, I observed MOOSANI's Telephone ping in the vicinity of **Subject Premises 1**.  I believe this is consistent with MOOSANI residing at **Subject Premises 1**.

53.  In addition to monitoring prospective GPS pings of MOOSANI, I monitored prospective GPS pings of LANG.  A large portion of LANG's Telephone pings were near **Subject Premises 2** especially in the early morning hours of the day.  On multiple

---

[4] On February 24, 2021, the Honorable Charles F. Eick, United States Magistrate Judge, issued a search warrant for historical cell-site information and prospective GPS pings of MOOSANI's Telephone (ending in 9551).  See 21-MJ-00926.  On April 8, 2021, an extension warrant for prospective GPS pings of MOOSANI's telephone was issued by the Honorable Michael R. Wilner, United States Magistrate Judge.

On April 2, 2021, the Honorable Rozella A. Oliver, United States Magistrate Judge, issued a search warrant for pings of LANG's Telephone (951-330-1550).  See 21-MJ-01599.

days, especially weekdays, LANG's Telephone was in the area of LANG's employment in Riverside, California.  Based on my training, experience, and knowledge of this investigation, I believe LANG resides at **Subject Premises 2**.

54.  During the coordination of the April 21, 2021, controlled purchase described above, I observed prospective GPS pings of MOOSANI's Telephone near the area of **Subject Premises 1**.  In addition, following the controlled purchase coupled with law enforcement observations of MOOSANI and LANG near **Subject Premises 1**, I observed prospective GPS pings of MOOSANI's Telephone and LANG's Telephone near each other and in the area of **Subject Premises 1**.

**J.   Subject Premises 1, Subject Premises 2 and Subject Vehicles 1, 2, and 3**

1.   Subject Premises 1

55.  **Subject Premises 1**, located at 111 S. Belleza Lane, Anaheim, CA 92807, is a two-story yellow/tan house with white garage doors, rock accents, and a green wrought-iron fence.  My belief that MOOSANI resides at **Subject Premises 1** is based, in part, because, of the following:

a.   On March 1, 2021, I observed **Subject Vehicle 1** backed into driveway with a charging cable running from **Subject Premises 1** to **Subject Vehicle 1**.  On March 2, 2021, **Subject Vehicle 1** was observed by law enforcement at **Subject Premises 1**, and MOOSANI told the UCA that MOOSANI was near "100 S. Belleza".  On April 21, 2021, MOOSANI again gave the address of 100 S. Belleza Lane, Anaheim, CA, to the UCA and stated the house is

for sale.  As of April 25, 2021, a commercial database indicates there is only one house for sale, **Subject Premises 1**, on S. Belleza Lane in Anaheim, CA.  On approximately April 22, 2021, MOOSANI posted photographs of the interior of **Subject Premises 1** on MOOSANI's Snapchat that matched the photographs on a commercial database advertising the sale of **Subject Premises 1.**

b.   Database queries of MOOSANI indicate MOOSANI resides at **Subject Premises 1** as MOOSANI was involved in a traffic collision in August 2020, and MOOSANI provided Anaheim Police Department with the address of **Subject Premises 1** as his residence.

c.   The billing address of MOOSANI's Telephone is **Subject Premises 1.**  The mailing address of MOOSANI's driver's license is **Subject Premises 1** as of September 22, 2020. According to California Employment Development Department, the mailing address of MOOSANI is **Subject Premises 1** as of June 13, 2020.

2.   Subject Premises 2

56.  **Subject Premises 2**, located at 6183 Academy Avenue, Riverside, CA, is a one-story white house with gray roofing.  My belief that LANG resides at **Subject Premises 2** is based, in part, because, of the following:

a.   Database queries of LANG indicate LANG resides at **Subject Premises 2.**  Further, the mailing address of vehicles registered in LANG's name is **Subject Premises 2.**

b.   The billing address of LANG's Telephone is **Subject Premises 2.**  The mailing address of LANG's California

27

driver's license has been **Subject Premises 2** since February 3, 2016. According to the California Employment Development Department, LANG's mailing address is **Subject Premises 2** as of May 31, 2020. On April 1, 2021, I observed **Subject Vehicle 3** parked in the driveway of **Subject Premises 2**.

        3.   Subject Vehicle 1

57.  **Subject Vehicle 1** is a 2017 Tesla with California license plate 8VHM522 and Vehicle Identification Number 5YJSA1E26HF185125, registered to MOOSANI at **Subject Premises 1**. I believe that **Subject Vehicle 1** is used by MOOSANI, in part, because (1) California Department of Motor Vehicle records show that it is registered to MOOSANI at **Subject Premises 1**, (2) law enforcement observed **Subject Vehicle 1** parked in the driveway of **Subject Premises 1**, and (3) law enforcement observed Snapchat photographs from MOOSANI'S Snapchat of a Tesla steering wheel in front of **Subject Premises 1**.

        4.   Subject Vehicle 2

58.  **Subject Vehicle 2** is a 2005 Dodge Neon with California license plate 8DDX921 and VIN 1B3ES66S15D113744, registered to LANG at **Subject Premises 2**. I believe **Subject Vehicle 2** is used by LANG, in part, because: 1) California Department of Motor Vehicle records show that it is registered to LANG at **Subject Premises 2**, 2) on April 15, 2021, law enforcement observed LANG drive and place **Subject Vehicle 2** on the vehicle lift at LANG's place of employment, and 3) on April 15, 2021, law enforcement observed LANG conduct what appeared to be a hand-to-hand drug deal in front of **Subject Vehicle 2**.

5.   Subject Vehicle 3

59.  **Subject Vehicle 3** is a 2016 Fiat with California license plate 7VCM747 and VIN ZFBCFXBT4GP361764, registered to R.C. at **Subject Premises 2**.  I believe that **Subject Vehicle 3** is used by LANG, in part, because 1) California Department of Motor Vehicle records show that is registered to **Subject Premises 2**, 2) law enforcement observed **Subject Vehicle 3** parked in the driveway of **Subject Premises 2** on April 1, 2021, and 3) law enforcement observed LANG operate and deliver approximately 1,000 tabs of suspected LSD and one half ounce of cocaine to the UCA in **Subject Vehicle 3**.

### V.   TRAINING AND EXPERIENCE ON DRUG OFFENSES[5]

60.  Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

a.   Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds.  Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their

---

[5] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

b.    Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs.  The aforementioned records are often maintained where drug traffickers have ready access to them, such as on their cell phones and other digital devices, and in their residences and vehicles.

c.    Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices.  This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal.  In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

d.    Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices and in their residences and vehicles. Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices and in their

residence, including in the form of calendar entries and location data.

  e.   Drug traffickers often use vehicles to transport their narcotics and may keep stashes of narcotics in their vehicles in the event of an unexpected opportunity to sell narcotics arises.

  f.   Drug traffickers often maintain on hand large amounts of United States currency in order to maintain and finance their ongoing drug trafficking businesses, which operate on a cash basis.  Such currency is often stored in their residences and vehicles.

  g.   Drug traffickers often keep drugs in places where they have ready access and control, such as at their residences or in their vehicles or in safes.  They also often keep other items related to their drug trafficking activities at their residence, such as digital scales, packaging materials, and proceeds of drug trafficking.  These items are often small enough to be easily hidden and thus may be kept at a drug trafficker's residence even if the drug trafficker lives with others who may be unaware of his criminal activity.

  h.   It is common for drug traffickers to own multiple phones of varying sophistication and cost as a method to diversify communications between various customers and suppliers.  These phones range from sophisticated smart phones using digital communications applications such as Blackberry Messenger, WhatsApp, and the like, to cheap, simple, and often

prepaid flip phones, known colloquially as "drop phones," for actual voice communications.

## VI. TRAINING AND EXPERIENCE ON DIGITAL DEVICES

61. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a. Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b. Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable

data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

62.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which

33

may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

    b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

63.   The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

    a.   Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

    b.   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when

34

a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

c.   The person who is in possession of a device or has the device among his or her belongings is likely a user of the device.  Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress MOOSANI's and LANG's thumb- and/or fingers on the device(s); and (2) hold the device(s) in front of MOOSANI's or LANG's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

64.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII.  REQUEST FOR NIGHTTIME SERVICE

65.  I request that the Court authorize investigators to serve these warrants during the nighttime, as set forth under Fed. R. Crim. Proc. 41(e)(2)(A)(ii).  Good cause for nighttime service exists because of the location of **Subject Premises 1** is in a secluded cul-de-sac.  During prior surveillance of **Subject Premises 1**, individuals in the area of **Subject Premises 1** detected law enforcement presence on multiple occasions.  At different parts of the day, multiple vehicles were parked in the

driveway of **Subject Premises 1** indicating multiple individuals were on and within the approximately 43,000 square foot lot of **Subject Premises 1**.  During prior surveillance of **Subject Premises 2**, law enforcement observed a security camera affixed to the garage and facing the roadway.  Furthermore, D.A., who is believed to be another drug trafficker within  the conspiracy, was arrested in December 2020 with multiple rounds of ammunition, a short-barreled fully automatic rifle, a pistol, metal firearm suppressor, and body armor.  Due to D.A. possessing multiple firearms and firearm paraphernalia, I believe it is reasonable to believe that other members in the drug conspiracy may possess firearms similar to that of D.A., or have access to obtain such firearms.  Based on my training and experience, individuals who deal large quantities of drugs, take many efforts to protect their illicit product, which include conducting counter-surveillance in an attempt to identify or protect against potential burglary and robbery by competing drug dealers and criminal elements, or to defend against search warrants or raids by law enforcement officers.  In doing so, drug traffickers create a high-risk situation in which both criminal elements and law enforcement can be the target of violence upon approach and entry into residences to effectuate valid search warrants.  A means of mitigating that potential threat in this case would be granting nighttime service.  Nighttime service will give law enforcement the ability to get within close proximity of the **Subject Premises 1** and **Subject Premises 2** if MOOSANI has deployed lookouts or if LANG is

viewing his security camera system in real-time.  The ability to serve the requested warrants at night will provide law enforcement with a better opportunity to enter the properties without incident to ensure everyone's safety.  Given these facts, I believe that nighttime service is warranted in this case.

### VIII.    CONCLUSION

66.  For all of the reasons described above, there is probable cause to believe that MOOSANI and LANG have violated 21 U.S.C. § 841(a)(1) (Distribution of Controlled Substances). There is also probable cause that the items to be seized described in Attachment B will be found in a search of the residences, vehicles, and persons described in Attachments A-1, A-2, A-3, A-4, A-5, A-6, and A-7.


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this __11th__da_ of Ma_,
2021.

HONORABLE STEVE KIM
UNITED STATES MAGISTRATE JUDGE